Filed 5/18/18 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| SADIE M. CURRY,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>EQUILON ENTERPRISES, LLC.,<br><br>　　　Defendant and Respondent. | E065764<br><br>(Super.Ct.No. RIC10014774)<br><br>ORDER MODIFYING OPINION;<br>AND DENIAL OF PETITION<br>FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |


The petition for rehearing filed by appellant on May 8, 2018, is denied. The opinion filed in this matter on April 26, 2018, is modified as follows:

The "**DISCUSSION**," section D starting on page 20 through "**DISCUSSION**" section F, which ends on page 39, is deleted and is replaced with the following:

**(")D.　DEFINITION NO. 2:　ENGAGE**

We examine whether there is a triable issue of fact concerning Shell being Curry's employer under the "to engage" definition of employer.

1. *LAW*

" '[T]o engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship." (*Martinez*, *supra*, 49 Cal.4th at p. 64, fn. omitted.) The common law test focuses on the issue of whether a worker is an employee or an independent contractor. (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 11.)

The essence of the common law employment test "is the 'control of details'—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work—but there are a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.] The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship." (*Estrada v. FedEx Ground Package System, Inc.*, *supra*, 154 Cal.App.4th at p. 10.)

2. *DISTINCT OCCUPATION OR BUSINESS*

The first factor is whether Curry engaged in a distinct occupation or business. Curry worked at two gas stations, one at Via Rancho and another at Carmel Mountain. The undisputed facts reflect, "As an ARS station manager, Curry supervised approximately five to seven ARS cashiers." Thus, Curry was engaged in the distinct occupation of an ARS station manager.

### 3. *SUPERVISED OR UNSUPERVISED*

The second factor is whether considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision. "While employed by ARS, Curry reported to and took direction from ARS employees . . . and, at times, from the manager of the ARS HR department." From this evidence it can be inferred that Curry's job was performed under the principal's direction. In this case, the principal was ARS. In regard to Shell providing direction to Curry, Shell required various tasks be performed by ARS; however, there is nothing indicating that Shell required Curry be the person to perform those tasks. It was ARS that required Curry to perform certain tasks.

### 4. *SKILLS*

The third factor is the skill required for the work. Curry worked directly for Shell from May 2001 to March 2003. From March to July 2003, Curry worked "at a gas station." "In July, 2003, Curry was contacted [by an ARS employee] for the purpose of recruiting Curry to become the manager of the Via Rancho Station." It can be inferred from this evidence that skills are needed for managing a gas station. The

evidence that Curry was recruited by ARS indicates a particular skill set was desired—ARS wanted a person with experience in the field.

The undisputed evidence reflects (1) "[Shell] never directed ARS to recruit, interview, hire, or promote any specific ARS employee"; and (2) "ARS alone determined what duties Curry should perform." Because Shell did not have input on the hiring process or Curry's job duties, it can be inferred that Shell did not require a particular skill set because Shell did not have input on the tasks performed by a particular employee.

### 5. *INSTRUMENTALITIES, TOOLS, AND PLACE OF WORK*

The fourth factor is whether the principal or worker supplies the instrumentalities, tools, and place of work. Curry's job training was provided by ARS. ARS required Curry attend environmental compliance courses taught by Shell. ARS paid for Curry's time at the classes. Curry was required to wear a shirt and a nametag that were purchased by ARS and given to Curry by ARS. Thus, ARS provided Curry with the information and uniform necessary to conduct her work.

Further, ARS operated the fueling facilities and leased the convenience stores and car wash facilities where Curry worked. Shell owned the fueling facilities. Thus, ARS and Shell provided Curry with a place to work—ARS provided the convenience store and car wash, while Shell provided the fueling station, i.e., the fueling islands. Shell also provided fuel and the fueling equipment, such as the fuel storage tanks. Curry's job duties included "many of the tasks set forth in the MSO Site Operations Manual, the CVP . . . Guide, and the [HSE Reference]." Therefore, it can be inferred

4

that Curry's job duties involved tasks such as determining the amount of fuel in the storage tanks. As a result, Shell provided some of the equipment for Curry's job, in that Curry performed tasks related to Shell's fueling equipment.

6. *LENGTH OF TIME*

The fifth factor is the length of time for which the services are to be performed. The undisputed facts reflect "ARS alone determined that Curry would be deemed an exempt employee . . . [and] when she would work." Thus, ARS determined what shifts Curry would work. The undisputed facts reflect, "ARS alone made all hiring, disciplinary and promotional decisions with respect to Curry." Thus, Curry's hiring and any possible termination would be decided by ARS. The undisputed facts reflect, "ARS alone also determined when Curry could take personal time off from work, when she could take vacations and when she could make up work time she missed." Thus, ARS decided when Curry could miss work. In sum, ARS decided the length of time for which Curry's work was to be performed.

Curry asserts Shell was able to determine the length of time Curry worked because Shell had the right to effectively terminate Curry. The MSO Contract provides, "Operator has the right to select, hire, and discharge such employees, provided, however, Operator shall remove any such employee promptly upon [Shell's] request for good cause shown. [Shell] shall not select, hire, discharge, supervise or instruct any of Operator's employees."

The MSO contract authorizes Shell to have ARS remove an ARS employee from a station, but does not permit Shell to terminate any ARS employee's employment. For

5

example, if Shell requested Curry be permanently removed from its stations, then ARS could employ Curry in its offices or assign Curry the off-site task of driving around checking competing station's gas prices. The evidence cited by Curry does not create a triable issue of fact as to whether Shell could terminate Curry's employment because it does not indicate that Shell could terminate Curry's employment.

7. *PAYMENT*

The sixth factor is the method of payment, whether by time or by job. When ARS offered Curry the position of manager of the Via Rancho Station, it offered an annual salary of $32,000. Thus, Curry was a salaried employee of ARS; she was not paid per project. The undisputed facts reflect ARS "maintained exclusive control over all payroll" for Curry. Thus, Curry was not paid by Shell.

8. *REGULAR BUSINESS*

The seventh factor is whether the work is part of the principal's regular business. "ARS operated approximately 15 gas stations in San Diego County and employed over 100 people at those stations." Given this undisputed fact, it can reasonably be inferred that Curry's management of two gas stations was part of ARS's regular business because ARS's business involved operating gas stations.

Shell owned approximately 365 fueling stations in California. There is nothing indicating Shell employed people at the gas stations. Thus, Curry's work at the fueling station was not part of Shell's business. In other words, Shell was not in the business of operating fueling stations—it was in the business of owning real estate and fuel.

6

Curry contends "Shell was and is in the business of selling its motor fuel at facilities which it owns. . . . ARS merely provided the station employees and made sure that they performed their tasks in the manner in which Shell dictated." Curry's argument is problematic. If ARS supplied the employees and supervised the employees' work, then ARS was in the business of operating the station, and Shell was in the business of owning the station.

For example, if the owner of an apartment complex hires a property management company, and that property management company hires an on-site manager for the complex, the owner is not engaged in the business of property management. Rather, the owner is in the business of owning real estate, while the property management company is in the business of managing properties. Shell's contract with ARS did not put Shell in the business of operating fuel stations.

9. *BELIEFS*

The eighth factor is whether the parties believe they are creating an employer-employee relationship. The undisputed facts reflect "Curry completed an Application for Employment with ARS" and "received, signed and returned to ARS a writing outlining her conditional offer of employment." These undisputed facts support the inference that Curry and ARS believed they were creating an employer-employee relationship.

In regard to Shell, when Curry met with the recruiter who recruited her to work at the Via Rancho station, Curry believed the recruiter was a Shell employee. However, at that recruitment meeting, "Curry completed an Application for Employment with

7

ARS." The reasonable inference from these undisputed facts is that Curry initially believed at the recruitment meeting that she was being offered a job by Shell, but came to understand in the recruitment meeting that she was being offered a job by ARS, hence the ARS job application. Thus, the undisputed facts do not reflect Shell and Curry believed they created an employer-employee relationship.

10. *CONCLUSION*

In sum, Shell, along with ARS, provided Curry a place to work and the equipment with which she performed her job. Providing a portion of Curry's work location and equipment is insufficient to raise a triable issue of material fact as to Shell being Curry's employer due to the many other factors reflecting Shell is not Curry's employer.

In other words, one could not reasonably conclude that Shell controlled the manner and means by which Curry accomplished her work because Shell did not supervise Curry, Shell did not have input on Curry's skills, Shell did not have control over the length of time Curry performed her job, Shell did not pay Curry, Shell was not in the business of operating service stations, and Shell and Curry did not believe they were creating an employer-employee relationship. Accordingly, we conclude Curry's causes of action fail under the "to engage" definition of employer.

11. *RWJ COS. V. EQUILON ENTERPRISES, LLC*

Curry relies on an unpublished federal trial court case from Indiana to support her position that Shell exercised control over the employees of gas station operators. (*RWJ Cos. V. Equilon Enters., LLC* (December 28, 2005, 1:05-cv-1394) [2005 U.S.

8

Dist. LEXIS 38329] (*RWJ*).)[1] RWJ operated 36 Shell branded gas stations in the Indianapolis area. (*Id.* at p. *1.) Shell notified RWJ that it intended to terminate RWJ's contracts and have another company operate the gas stations. RWJ sued Shell, seeking a preliminary injunction to prevent the termination of its contracts. RWJ relied upon the Indiana Deceptive Franchise Practices Act. (*Id.* at pp. *1-2.) Ultimately, the trial court denied the request for a preliminary injunction. (*Id.* at p. *31.)

The trial court examined whether RWJ's contract with Shell was a franchise agreement. (*RWJ*, *supra*, 2005 U.S. Dist. LEXIS 38329, *5.) In conducting its analysis, the court wrote, "The evidence in this case shows that Shell retained extensive control over the marketing of fuel and every aspect of the filling station operation, as well as substantial control over the marketing of convenience store products and services. When reading cases addressing this issue, it is important to recognize that RWJ operates only Shell-branded filling stations and that RWJ's convenience stores are associated very closely with both the filling station operations and the Shell brand." (*Id.* at p. *14.)

In *RWJ*, the control that Shell exercised was over RWJ—not the employees of RWJ. For example, Shell may have required certain tasks to be performed by RWJ, but it appears RWJ could choose which employees performed those tasks. The relationship examined in *RWJ* was the relationship between Shell and RWJ, not Shell and the

---

[1] "[T]he California Rules of Court do not prohibit citation to unpublished federal cases, which may properly be cited as persuasive, although not binding, authority." (*Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 251, fn. 6.)

employees of RWJ. Accordingly, we find Curry's reliance on *RWJ* to be unpersuasive because it is not the same issue presented in the instant case.

> 12.    *CASTANEDA V. THE ENSIGN GROUP, INC.*

Curry relies on *Castaneda v. Ensign Group, Inc.* (2014) 229 Cal.App.4th 1015 (*Castaneda*) to support her assertion that Shell exercised control over her as an employee of ARS. In *Castaneda*, the named plaintiff, John Castaneda, filed a class action alleging The Ensign Group, Inc. (Ensign) was the alter ego of Cabrillo Rehabilitation and Care Center (Cabrillo). Ensign had no employees and was the owner of Cabrillo. Castaneda asserted Ensign was his actual employer and its corporate veil should be pierced. (*Id.* at pp. 1017-1018.)

The appellate court considered what it means to be an employer, and looked to *Martinez* and its definition concerning the control of different aspects of the employment relationship. (*Castaneda*, *supra*, 229 Cal.App.4th at p. 1019.) The appellate court noted, "Ensign has more than a contractual relationship with Cabrillo. *Ensign owns Cabrillo*." (*Id.* at p. 1020.) The court explained that Ensign's ownership of Cabrillo could cause a trier of fact to disbelieve Ensign's contention that it did not control Cabrillo. (*Ibid.*) Further, a staff person at Ensign's corporate office recruited employees for Cabrillo to hire, and the director of Cabrillo received his employment orientation training at Ensign. (*Ibid.*)

Additionally, Ensign's forms were used at Cabrillo, Ensign instructed Cabrillo employees to increase revenues, Ensign replaced Cabrillo's computers and timeclocks, Ensign required Cabrillo employees to use the new timecard system, Ensign sent

10

consultants to Cabrillo to advise employees on how to perform their duties, Ensign's employee handbook notified Cabrillo employees that there was an employee emergency fund for employees who experienced hardship, Cabrillo employees received paychecks from Ensign Facility Services, Cabrillo employees' e-mail addresses were in the form of name@ensigngroup.net, the Vice President of Ensign set the rate of pay for Cabrillo employees, employment benefits for Cabrillo's employees were administered through Ensign, and Ensign handled issues related to disciplining Cabrillo employees. (*Castaneda*, *supra*, 229 Cal.App.4th at p. 1021-1024.)  The appellate court concluded there were triable issues of fact concerning Ensign being Castaneda's employer. (*Id.* at p. 1018.)

Curry relies on *Castaneda* for the proposition that "[j]oint employer status has been found to exist on far less compelling facts" than the facts presented in the instant case.  Curry, relying on *Castaneda*, contends that requiring an employee to wear the logo of the alleged secondary employer can support a finding that the alleged secondary employer is a joint employer.  We do not find *Castaneda* to be illustrative of Curry's point.  *Castaneda* has far more compelling facts for joint employment than the instant case, such as (1) Ensign owning Cabrillo; (2) Ensign setting the rate of pay for employees; and (3) Ensign administering employee benefits.  Because *Castaneda* does not illustrate joint employment being found on weaker facts than those in the instant case, we do not find Curry's reliance on *Castaneda* to be persuasive.

11

E.    DEFINITION NO. 3:  SUFFER OR PERMIT TO WORK

We examine whether there is a triable issue of fact as to Shell being Curry's employer due to Shell suffering Curry or permitting Curry to work.  (Cal. Code Regs., tit. 8, § 11070, subd. (2)(D); *Martinez*, *supra*, 49 Cal.4th at p. 64.)  The language concerning an employer suffering or permitting a person to work was derived from a desire to prevent evasion from liability by a claim that a person was not employed in a traditional master/servant relationship.  (*Martinez*, at p. 58.)  The language arose from child labor laws.  For example, children under age 14 were not permitted to work.  Nevertheless, coal miners paid a boy to carry water for them and the boy sustained injuries while working.  The boy was not employed in a traditional sense by the mining company, but the mining company permitted or suffered the boy's work.  (*Id.* at p. 58, citing *Purtell v. Philadelphia & Reading Coal & Iron Co.* (1912) 256 Ill. 110, 111, 117.)  This definition has been interpreted to mean "the employer 'shall not . . . permit by acquiescence, nor suffer by a failure to hinder.' " (*Martinez*, at p. 58, italics omitted.)  Put differently, "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring." (*Id.* at p. 69, italics omitted.)

Accordingly, we examine if Shell met its burden of establishing there is no triable issue of fact as to whether Shell permitted or suffered Curry's work at the station.  The undisputed facts reflect, (1) "The *MSO operator was responsible* for hiring, firing, disciplining, training, compensating and maintaining payroll records for all employees working at the station"; and (2) "the MSO operator always maintained control over the daily work of its own employees." (Italics added.)

12

The undisputed evidence reflects Curry's hiring, firing, and daily tasks were ARS's responsibility. Thus, Shell did not acquiesce to Curry's employment because Shell was not in a position to terminate Curry or hire a different person to perform the tasks Curry performed. In other words, Shell had no role to play—it could not hire Curry or terminate Curry's employment. Thus, Shell could not acquiesce to Curry's employment.

In regard to suffering by a failure to hinder, Shell had the authority to have Curry removed from the station upon "good cause shown." There is no evidence indicating what Shell may have cited as good cause for physically removing Curry from the station so as to prevent her from working her regularly scheduled shifts. Because the "good cause shown" clause was not triggered, Shell could not have Curry physically removed from the station. Thus, Shell did not have the ability to hinder Curry's work and, in turn, could not have failed to hinder Curry's work. In sum, Shell has met its burden of establishing there is not a triable issue of fact concerning Shell being Curry's employer based on the definition of suffering or permitting Curry to work.

We now examine whether Curry has met her burden of establishing there is a triable issue of material fact. Curry asserts "Shell caused her to suffer the non-payment of overtime by failing to 'hinder' ARS." Suffering concerns the alleged employer's failure to hinder the alleged employee's work by not stopping the alleged employee from working, e.g., not stopping the boy from carrying water to the coalminers. (*Martinez*, *supra*, 49 Cal.4th at pp. 58, 69-70 ["*failure to prevent* the work from occurring"].) It does not concern suffering by the employee due to the alleged failure to

13

pay wages owed. Also it does not concern failing to hinder a third party, e.g., ARS. Accordingly, we conclude Curry has failed to meet her burden of establishing there is a triable issue of fact as to Shell being Curry's employer based upon the definition of suffering or permitting Curry to work.

Thus, we conclude Curry's causes of action fail under the "suffering or permitting" definition of employer.

Curry contends this court should apply the "ABC test" definition of the "suffer or permit to work" test recently set forth in *Dynamex Operations West, Inc. v. Superior Court* (2018) ____ Cal.5th ____ [2018 Cal. LEXIS 3152] (*Dynamex*)

In *Dynamex*, workers, who served as delivery drivers, asserted they had been misclassified as independent contractors, rather than employees. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *5-6.) The workers argued the trial court should apply the tests from *Martinez* when analyzing whether there was an employee-employer relationship. In contrast, Dynamex, the hiring entity, argued the *Martinez* tests are only applicable when determining if there is a joint employer. (*Dynamex*, at p. *20.) The trial court agreed with the workers. The trial court concluded *Martinez* was not limited to joint employment issues. (*Id.* at pp. *20-21)

Procedurally, the issue before the trial court was whether the class of workers/plaintiffs had more common issues than individual issues, i.e., sufficient commonality for class certification. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *21.) The trial court applied the law from *Martinez*, concluded common issues predominated,

14

and certified the class. (*Dynamex*, at pp. 21-22, 27-28) Dynamex moved to decertify the class, and the trial court denied the motion. (*Id.* at pp. 28-29.)

Dynamex petitioned for a writ of mandate at the Court of Appeal, challenging the denial of its motion to decertify the class. Plaintiffs requested the Court of Appeal issue an order to show cause and resolve the issues presented in the writ, in particular whether the trial court erred in using the *Martinez* definitions of "employ" and "employer" when certifying the class. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *29.) The appellate court concluded the trial court properly relied upon *Martinez*. (*Dynamex*, at p. *29.)

Dynamex filed a petition for review challenging the Court of Appeal's conclusion that the trial court properly relied on *Martinez*. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *30.) The Supreme Court granted review. The issue before the Supreme Court was whether the tests/definitions of "employ" and "employer" set forth in *Martinez* were applicable when determining if a worker was misclassified as an independent contractor, rather than an employee. (*Dynamex*, at pp. 4-5.) The high court explained that the "heart of the issue" was the scope of *Martinez*, i.e., whether *Martinez* extends beyond the issue of joint employment. (*Dynamex*, at p. 49.)

*Martinez* provides three alternative definitions/tests for analyzing if an employment relationship exists, including the "suffer or permit to work" test discussed *ante*. The high court, in *Dynamex*, concluded the "suffer or permit to work" test applied when analyzing whether a worker was misclassified as an independent contractor, rather than an employee. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *56-57, 66.) In other words, the Supreme Court concluded it was proper to rely upon *Martinez*, in particular,

15

the "suffer or permit to work" test, in context of the of allegedly misclassified independent contractors. (*Dynamex*, at p., *66.)

The high court went on to explain how the "suffer or permit to work" test operates. The court chose a method of operation known as the "ABC" test. (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *88-90.) Under the "ABC" test, the burden of proof is on the hiring entity to prove, "(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." (*Id.* at pp. *89-90.)

The high court concluded, "It bears emphasis that in order to establish that a worker is an independent contractor under the ABC standard, the hiring entity is required to establish the existence of the three parts of the ABC standard." (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *98.) If the hiring entity fails to establish one of the three factors, then the worker should be treated as an employee, rather than an independent contractor. (*Ibid.*)

The high court explained the policy reasons behind its selection of the "ABC" test, with the burden being on the alleged employer: "[T]he risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors. Such

incentives include the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees. In recent years, the relevant regulatory agencies of both the federal and state governments have declared that the misclassification of workers as independent contractors rather than employees is a very serious problem, depriving federal and state governments of billions of dollars in tax revenue and millions of workers of the labor law protections to which they are entitled." (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *4.)

The issue we confront is whether the high court intended the "ABC" test to apply beyond the independent contractor context. On one hand, the Supreme Court was discussing the test from *Martinez*, and *Martinez* is a joint employment case (*Martinez*, *supra*, 49 Cal.4th at p. 50). (*Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *49 [heart of the issue is the scope of *Martinez*].) Therefore, arguably, the Supreme Court intended for the "ABC" test to extend beyond the independent contractor context to the joint employment context.

However, the Supreme Court's policy reasons for selecting the "ABC" test are uniquely relevant to the issue of allegedly misclassified independent contractors. In the joint employment context, the alleged employee is already considered an employee of the primary employer; the issue is whether the employee is also an employee of the alleged secondary employer. Therefore, the primary employer is presumably paying taxes and the employee is afforded legal protections due to being an employee of the

17

primary employer.  As a result, the policy purpose for presuming the worker to be an employee and requiring the secondary employer to disprove the worker's status as an employee is unnecessary in that taxes are being paid and the worker has employment protections.  (See *Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *3-4.)

In conclusion, the "ABC" test set forth in *Dynamex* is directed toward the issue of whether employees were misclassified as independent contractors.  Placing the burden on the alleged employer to prove that the worker is not an employee is meant to serve policy goals that are not relevant in the joint employment context.  Therefore, it does not appear that the Supreme Court intended for the "ABC" test to be applied in joint employment cases.

Nevertheless, out of an abundance of caution, and because much of the analysis has already been completed *ante*, we will discuss the "ABC" factors.  The "A" factor requires an examination of whether the "worker is free from the control and direction of the hiring entity."  (See *Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *89-90.)  We examined *ante*, whether Shell met its burden of establishing it did not exercise control over Curry's wages, hours, or working conditions.  We concluded *ante* that there is not a triable issue of fact as to Shell having exercised control over Curry's wages, hours, or working conditions.  Accordingly, we conclude there is not a triable issue of fact under the "A" factor concerning whether Curry was free from Shell's control and direction.

The "B" factor requires an examination of whether "the worker performs work that is outside the usual course of the hiring entity's business."  (See *Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *90.)  For example, if a bakery hires cake decorators to work on

18

a regular basis, then those cake decorators are likely working within the bakery's "usual business operation," and thus would be employees. Whereas an electrician hired to work at a bakery would likely be viewed as not working within the bakery's usual course of business and therefore would not be viewed as an employee. (*Id.* at pp. *92-93.)

We concluded *ante* that Curry was engaged in the distinct occupation of an ARS station manager. We also concluded *ante* that Curry's "management of two gas stations was part of ARS's regular business because ARS's business involved operating gas stations." We explained that "Shell was not in the business of operating fueling stations—it was in the business of owning real estate and fuel." Thus, there is not a triable issue of fact as to the "B" factor because managing a fuel station was not the type of business in which Shell was engaged.

The "C" factor requires evidence "that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." (See *Dynamex*, *supra*, 2018 Cal. LEXIS 3152, *88.) This factor can be proven with evidence that the worker has "take[n] the usual steps to establish and promote his or her independent business—for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public or to a number of potential customers, and the like." (*Id.* at p. *97.)

As explained *ante*, in the policy section of this discussion, the "ABC" test is directed toward the issue of allegedly misclassified independent contractors. Trying to

19

apply the "C" factor in a joint employment case will lead to an analysis that is a blend of the "A" and "B" factors, e.g., whether Curry was engaged in an occupation independent from the alleged secondary employer. As explained in the "A" analysis, Shell did not exercise control over Curry. As explained in the "B" analysis, Curry's management of the gas stations was distinct from the type of business Shell engages in, which is the ownership of real estate and fuel. Therefore, under the "C" factor, Curry worked at an independent business and Shell did not exercise control over her. As a result, Curry was engaged in an independently established occupation. We conclude there is not a triable issue of fact under the "C" factor. In sum, there is not a triable issue of fact under the "ABC" test, to the extent it applies in the joint employment context.

F.     CONCLUSION

In conclusion, Curry's three causes of action fail because there is not a triable issue of material fact concerning Shell being Curry's employer under any of the three legal definitions of employer set forth in *Martinez*. The trial court properly granted summary judgment.**(")**

Except for these modifications, the opinion remains unchanged. The modifications do not effect a change in the judgment.

CERTIFIED FOR PUBLICATION

MILLER_____
                                                    Acting P. J.

We concur:
CODRINGTON_____
                                    J.
SLOUGH_____
_____J.

20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| SADIE M. CURRY, | |
| Plaintiff and Appellant, | E065764 |
| v. | (Super.Ct.No. RIC10014774) |
| EQUILON ENTERPRISES, LLC, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Sharon J. Waters, Judge. Affirmed.

Samuel T. Rees for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo and Remy Joseph Kessler for Defendant and Respondent.

Plaintiff and appellant Sadie M. Curry brought a class action case against defendant and respondent Equilon Enterprises, LLC, doing business as Shell Oil Products US (Shell). Curry's causes of action included (1) failure to pay overtime compensation; (2) failure to pay for missed break periods; and (3) unfair business practices (Bus. & Prof. Code, § 17200). The trial court found Shell was not Curry's

1

employer and therefore granted Shell's motion for summary judgment. Curry contends the trial court erred in its finding and by granting summary judgment. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>BACKGROUND</u>

Prior to May 2003, Shell owned approximately 365 service stations in California. Shell operated some of the stations itself, with its own employees. Prior to May 2003, Shell changed its business model. Shell no longer operated its own service stations with its own employees. Instead, Shell offered leases and operating agreements to entities that sought to run Shell's service stations. The leases provided that the operators/lessees (Operators) had a lease interest in the service stations' convenience stores and car wash facilities. Operators retained all the profits from the convenience stores and car wash facilities.

The operating agreements were known as "Multi-Site Contractor Operated Retail Outlet Agreements" (MSO Contract). Under the MSO Contract, Operators operated the stations' fuel facilities for Shell in exchange for compensation from Shell.[2] Shell owned the gasoline that was sold to customers. Shell received all the revenue from the fuel sales. Shell unilaterally set the fuel prices. Operators were required to complete daily gasoline price surveys from competing gas stations, submit that information to

---

        [2] The parties stipulated that the MSO contract was not a franchise agreement. (15 U.S.C.A. § 2801; Bus. & Prof. Code, § 20999.)

2

Shell, and then change the fuel prices as directed by Shell. Shell reimbursed Operators for the labor expenses associated with operating the fuel portion of the service station.

In addition to the daily price surveys, Shell required Operators to perform various tasks for the purposes of maintenance, safety, accounting, and maintaining Shell's brand standards. The tasks were set forth in the "MSO Site Operations Manual," which was produced by Shell. Although Shell required Operators to conduct certain tasks, "operator[s] always maintained control over the daily work of [their] own employees."

Some of the tasks that were required included: (1) daily inventory reconciliation of fuel—tracking the amount of fuel stored in Shell's tanks against the amount of fuel sold to customers; (2) routine maintenance of the car wash performed by certified technicians; (3) maintaining a file of station records, such as sales reports, any credit card imprints, and recorded "drive-offs"/non-payments; (4) on a daily basis, transmitting a report of fuel sales and credit card data; and (5) on a monthly basis, transmitting a report of convenience store and car wash sales.

One clause in the MSO Contract provided, "Operator has the right to select, hire, and discharge such employees, provided, however, Operator shall remove any such employee promptly upon [Shell's] request for good cause shown. [Shell] shall not select, hire, discharge, supervise or instruct any of Operator's employees." Another clause in the MSO Contract provided, "[Shell], its agents, and representatives may enter any [station], at all reasonable times, to inspect the facilities, procedures, and material being used in the sale of the Motor Fuel Products or other products, to obtain samples of

3

and conduct tests on the Motor Fuel Products, to inspect the Records, and to audit, observe, and otherwise verify Operator's compliance with this Agreement."

Shell also provided Operators with an "Enhanced Customer Value Proposition Reference Guide" (CVP Guide). The CVP Guide was designed to help Operators meet Shell's brand standards by recommending certain tasks and frequencies for the performance of the tasks. Some examples: (1) fuel price signs should be clean and unobstructed, therefore signs should be inspected daily; (2) landscaping should be well maintained without weeds or garbage, therefore weeds should be pulled on a weekly basis and litter should be collected at least once a shift; and (3) the air and water machine should function properly, therefore, at the start of each shift, the machine should be inspected. The CVP Guide explained that because the Operators' stations are independent businesses, different methods or frequencies may be used than those recommended by Shell.

Shell also provided Operators with a "Retail Service Station Health, Safety and Environmental Reference Manual" (HSE Reference). The HSE Reference "contains summary information about various Federal health, safety and environmental laws and regulations." It also contains information about how to deter robberies.

From May 2001 to March 5, 2003, Curry was employed directly by Shell and worked at a station in Menifee. In March 2003, Curry began working at a gas station operated by Circle K Stores, Inc., which was not affiliated with Shell.

A.R.S., a limited liability company (ARS) had an MSO Contract and leases with Shell. "ARS operated approximately 15 gas stations throughout San Diego County and

4

employed over 100 people at those stations." One of ARS's stations was the Via Rancho station. Another of ARS's stations was the Carmel Mountain station. The Via Rancho station and the Carmel Mountain station each had a convenience store and a car wash. Both stations had copies of the MSO Site Operations Manual, the CVP Guide, and the HSE Reference.

In July 2003, Curry met with an ARS employee who recruited Curry to manage the Via Rancho station in exchange for a $32,000 annual salary. Curry completed an ARS employment application, and then signed ARS's offer of employment. Curry was not required to read the MSO Site Operations Manual, CVP Guide, or HSE Reference.

ARS assigned Curry's job duties. Curry reported to ARS employees. Curry was trained by ARS employees. The cashiers supervised by Curry were ARS employees. In April 2004, Curry "was promoted by ARS to multi-site manager and at that time became manager of [a second station,] the Carmel Mountain Station." The cashiers Curry supervised at the Carmel Mountain Station were ARS employees.

Curry prepared daily reports for ARS. "Curry was instructed by ARS to conduct gas surveys and to transmit on a daily basis . . . the information/results to ARS." When Shell inspected the two stations Curry managed, if Curry was present then she walked around the station with the inspector. Inspections occurred three to four times a year.

"ARS alone determined that Curry would be deemed an exempt employee, at which station(s) Curry would work, when she would work and what compensation and health and welfare benefits she should receive. ARS also undertook responsibility for paying Curry." "ARS alone made all hiring, disciplinary and promotional decisions

5

with respect to Curry." "ARS alone approved salary increases for Curry." "ARS alone set discipline guidelines for its own employees, including Curry." "ARS alone determined what duties Curry should perform based on operational demands . . . . ARS alone also determined when Curry could take personal time off from work, when she could take vacations and when she could make up work time she missed." "[Shell] never directed ARS to recruit, interview, hire, or promote any specific ARS employee."

Under the MSO Contract, the stations were required to be open 24 hours a day, seven days a week. The stations could not close for employee break periods. The Via Rancho and Carmel Mountain stations operated on a schedule of three eight-hour shifts. At least one cashier was scheduled to work along with Curry during an eight-hour shift. "During her employment with ARS, Curry testified that she routinely worked more than 40 hours in a work week and was never paid overtime; did not take a 30 minute off-duty meal break each day she worked more than 5 hours and while a cashier was also working and was not paid any compensation for a missed meal break; and did not take a 10 minute off-duty rest break each day she worked more than 3.5 hours and was not paid any compensation for a missed rest break."

B.    SECOND AMENDED COMPLAINT

Curry brought three causes of action in her Second Amended Complaint: (1) failure to pay overtime compensation; (2) failure to pay for missed break periods; and (3) unfair business practices (Bus. & Prof. Code, § 17200). The case was brought on behalf of Curry and all other persons similarly employed "at third party operated service stations located in the State of California, which stations on or after March 1,

6

2003 or the date the station was converted to a multi-site operated station sold motor fuel products owned at the time of sale to the public by Shell . . . and were operated by third party multi-site operators, including A.R.S."

Curry asserted she was misclassified as an exempt employee. Curry complained of (1) being denied overtime wages for periods when she worked more than eight hours a day or more than 40 hours a week; and (2) being denied meal and rest breaks without additional compensation. Curry sought unpaid wages, statutory penalties, interest, attorneys' fees, costs, restitution, an injunction, and any other proper relief.

Curry alleged Shell was her joint employer, along with ARS. Curry asserted Operators operated the fuel portion of the service stations for Shell's benefit and Shell reimbursed Operators for the labor expenses associated with operating the fuel portion of the business. Curry alleged "Shell both directly and indirectly controlled the wages, hours or working condition[s] of these employees through, among other ways, common contractual requirements of duties and tasks to be performed by station employees, the right to demand that specific employees be terminated, common Employer Compliance Program requirements, common training of operators, common manuals including a site operations manual, the . . . CVP Guide, the [HSE Reference,] and other manuals dealing with the fuel side of the business which the operators and station employees were required to follow pursuant to the common contracts and periodic inspections of the stations by Shell employees or other Shell contractors.

"In addition, Shell also entered into a lease with each operator, including ARS, for a portion of the station property, normally the convenience store and any car wash

on the property. . . . Notwithstanding these leases, Shell both directly and indirectly controlled the wages, hours, or working condition[s] of the employees working at these stations through, among other ways, interrelated contractual requirements in the operating contracts regarding duties and tasks to be performed by station employees and the right to demand that specific employees be terminated, common training of operators, common manuals including a site operations manual, the . . . CVP Guide which included requirements for the leased portion of the property, the [HSE Reference,] and other manuals dealing with the fuel side of the business and periodic inspections of the stations by Shell employees or other Shell contractors.

"In addition, Shell indirectly controlled wages at the stations through its unilateral setting of contract payments. Shell further has indirectly controlled working conditions at the stations through its common contracts and in mandating that the operators keep their stations open and staffed 24 hours a day, every day of the year . . . . Shell has also permitted or caused station employees to suffer the requirement that stations not be closed to permit employees who are working alone to close their station to take 'off-duty' meal or rest breaks. The combination of the Shell unilaterally set contract payments and the 24/7 Requirement has caused its operators to misclassify station employees as exempt to require that they work more than 8 hours in a workday and/more than 40 hours in a work week in order to reduce labor costs and make a profit and has caused its operators to deny off-duty meal and rest breaks to employees working alone. As a result of the foregoing, Shell is the joint employer of the

8

employees working at these stations while operated by these third party operators, including ARS."

C.    MOTION FOR SUMMARY JUDGMENT

Shell moved for summary judgment. Shell asserted Curry was not employed by Shell and therefore her case against Shell failed. Shell contended it had a business relationship with ARS while Curry worked for ARS, but ARS alone "managed and controlled every aspect of its employment relationship with its gas station employees such as Curry. For example, ARS made all recruiting, interviewing, hiring, disciplinary, promotional and termination decisions with respect to its own employees. ARS implemented its own personnel policies and procedures for its own employees. ARS determined exclusively the terms and conditions of the employment of its employees, including how much to pay them and what benefits, if any, to provide them. ARS also determined what duties should be performed by its own employees based on operational demands and requirements. Moreover, ARS maintained exclusive control over all payroll, human resources and record keeping functions. ARS also controlled the manner and means by which work was performed by its employees at the stations and it controlled the day-to-day operations of its stations." Shell asserted its requirement that ARS maintain Shell's brand image did not cause Shell to become Curry's employer.

D.    OPPOSITION

Curry opposed Shell's motion for summary judgment. Curry asserted there were two independent businesses at the service stations: (1) a convenience store and car wash business owned by ARS, and (2) a fuel business owned by Shell. Curry

9

contended the fuel business was the primary business. Curry asserted Shell, through ARS, exercised control over her wages, hours, and working conditions. Shell's control was established through the MSO contract, the MSO Site Operations Manual, the CVP Guide, the HSE Reference, accounting equipment and requirements, and periodic inspections.

Curry asserted "that upon recognition of the fact that [Shell] operates a separate business of selling motor fuel to the public for solely its own economic benefit and upon recognition of the fact that [Shell] mandates how that business will be operated primarily by service station employees, it is clear that a reasonable jury could find that [Shell] was the joint employer of those service station employees."

E.     HEARING

The trial court held a hearing on Shell's motion for summary judgment. Curry argued that ARS received no revenue from the fuel sales, so it was effectively Shell that was directing station employees to conduct fuel pricing surveys. Curry argued, "So Shell is the one that's telling the station employees, 'You must go out and perform the gas surveys.' Shell is the one who wants to make sure that the motor fuel is put into the tanks. Who's responsible for overseeing that? The station employees. What equipment is being used? Is it any of our equipment? No, ARS doesn't even have a right to where the equipment is. The yard, the pumps, the canopy piece, the underground tanks all belong 100 percent to [Shell].

"So [Shell] says, I need a warm body there to make sure we get the [fuel] deliveries, that the deliveries go into the tank, and then I need to have the warm body

10

get the invoice from the fuel truck, and put it in their financial reports, that under the MSO site operations manual has to be transmitted to [Shell] on a daily basis together with all the cash receipts.

"Now, how does the station employee figure out what all the cash receipts and all this other information is? They use Shell-owned equipment. You've got these—and I'm sure you've seen them. You walk into the station, and you have your little Snickers bar, and you walk up to the cash register, they scan the bar code [*sic*], [which] goes directly into the computer, which directly communicates with Shell."

Shell argued, "ARS makes the determinations as to how to comply with these agreements. [Shell] did not tell ARS how many employees to put in its stations. It didn't say when these employees were supposed to work, how these employees were supposed to work. ARS had its own supervisory chain of command telling its own employees, when, how, and where to do the work."

Shell continued, "[E]ven though those manuals are there [in the stations], and in fact one of the stipulated facts is that Curry admits she never read the manuals. So how can [Shell] be exercising the control over Curry if Curry wasn't required to read the manuals? And the reason why she wasn't required to read the manuals is because ARS was responsible for complying with its contracts and what was in the manuals and directing its employees as to what to do. [¶] . . . [¶] The gas surveys, for instance, that [Curry] brought up. There was no requirement under any contract that the surveys be done by a station employee. ARS could assign a manager to go out there—meaning an office manager or a secretary to go out and do gas surveys if it chose to do so."

11

Shell argued, "Again, [Curry] kept referring to the fact that Shell is telling the ARS employees what to do. There's no evidence of that. Shell is not telling Ms. Curry anything to do. Shell has contractual obligations with ARS that ARS is obligated to follow, and the contract, as I said before, specifically states between the parties that ARS at all times maintains operational control and it makes the decision as to how the contract is going to be complied with."

The trial court took the matter under submission. In a written ruling, the trial court found Shell "was not Curry's employer, either solely or jointly" and therefore her causes of action failed. The trial court explained, "[Shell] did not determine Curry's compensation, did not pay the work she performed and did not handle tax reporting. [Shell] did not determine what employment benefits Curry would receive. [Shell] did not set employment policies for ARS employees. [Shell] did not make disciplinary decisions, including termination decisions, involving ARS employees. [Shell] did not tell Curry where to work or what duties to perform. In addition, neither the terms of the MSO contract, the MSO lease, the operational manuals and training provided by [Shell] nor the periodic gas station inspections performed by [Shell] support Curry's employment theory." The trial court issued an order granting Shell's motion for summary judgment.

## DISCUSSION

### A. STANDARD OF REVIEW

"A defendant moving for summary judgment . . . 'bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to

12

judgment as a matter of law.' [Citation.] To meet this burden, the defendant must show one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. [Citation.] This burden can be met by relying on the opposing party's factually inadequate discovery responses if these responses show the plaintiff 'will be unable to prove its case by any means.' [Citations.] A defendant seeking to prevail on this ground must make an affirmative showing that the plaintiff does not possess, and cannot reasonably obtain, evidence to prove his or her case.

"If the defendant does not present sufficient evidence to meet its initial burden, the court must deny the motion. [Citation.] But if the defendant satisfies its burden, ' "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." ' [Citation.] The plaintiff must present admissible evidence to establish a triable issue of fact. [Citation.] An 'issue of fact . . . is not created by "speculation, conjecture, imagination or guess work." ' " (*Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 246.)

We apply the de novo standard of review. (*Silva v. See's Candy Shops, Inc.*, *supra*, 7 Cal.App.5th at p. 246.) "In evaluating the record, we strictly scrutinize the moving party's papers and resolve all doubts in the opposing party's favor." (*Id.* at p. 247.)

B.    LAW

The Industrial Welfare Commission (IWC) "is empowered to promulgate regulations known as 'wage orders' governing wages, hours, and working conditions in

the State of California. [Citation.] Currently, there are 16 effective wage orders, most of which cover specific industries. [Citations.] The terms of IWC wage orders are accorded great deference by California courts." (*Aleman v. AirTouch Cellular* (2012) 209 Cal.App.4th 556, 567-568.)

The IWC wage order cited in all three of Curry's causes of action is Order No. 7-2001 (Wage Order No. 7). (Cal. Code Regs., tit. 8, § 11070.) Wage Order No. 7 concerns the mercantile industry, which means a business "operated for the purpose of purchasing, selling, or distributing goods or commodities." (Cal. Code Regs., tit. 8, § 11070, subd. (2)(H).)

Wage Order No. 7 provides that work in excess of eight hours a day or in excess of 40 hours a week must be compensated as overtime. (Cal. Code Regs., tit. 8, § 11070, subd. (3)(A)(1).) Wage Order No. 7 requires a minimum 30 minute meal break for shifts longer than five hours, and a 10 minute rest break a four hour period worked. (Cal. Code Regs., tit. 8, § 11070, subds. (11)&(12).) The breaks and overtime compensation are to be provided to employees by employers. (Cal. Code Regs., tit. 8, § 11070, subds. (3), (11) & (12); *Martinez v. Combs* (2010) 49 Cal.4th 35, 49 (*Martinez*) ["only an employer can be liable"].)

Wage Order No. 7 defines "Employer" as a person or business "who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11070, subd. (2)(F).) An "Employee" is defined as "any person employed by an employer." (Cal. Code Regs., tit. 8, § 11070, subd. (2)(E).) "Employ" is defined as

14

"engag[ing], suffer[ing], or permit[ting] to work." (Cal. Code Regs., tit. 8, § 11070, subd. (2)(D).)

In *Martinez,* our Supreme Court examined "the question of how employment should be defined." (*Martinez, supra,* 49 Cal.4th at p. 50.) The high court concluded "the IWC's wage orders do generally define the employment relationship, and thus who may be liable." (*Id.* at p. 52.) The high court held, "To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours, or working conditions[, which is taken from the IWC definition of "employer"], *or* (b) to suffer or permit to work[, which is taken from the IWC definition of "employ"], *or* (c) to engage," which is taken from the IWC definition of "employ." (*Id.* at p. 64.)

## C.     DEFINITION NO. 1:  WAGES, HOURS, OR CONDITIONS

We examine whether there is a triable issue of fact as to Shell being Curry's employer due to Shell "exercise[ing] control over [Curry's] wages, hours, or working conditions." (Cal. Code Regs., tit. 8, § 11070, subd. (2)(F); *Martinez, supra,* 49 Cal.4th at p. 64.)

The undisputed facts reflect:

(1) "The *MSO operator was responsible* for hiring, firing, disciplining, training, compensating and maintaining payroll records for all employees working at the station" (italics added);

(2) "[Shell] was aware that many of the specified maintenance responsibilities for the stations would be performed by MSO employees working at the stations

15

although the *MSO operator maintained the right and ability* to assign any employee to perform such duties" (italics added);

(3) "Under the MSO Contract and in order to maintain Shell['s] brand standards, as well as for maintenance, health, safety, environmental and/or accounting purposes, *the MSO operator was required* to follow and ensure that its employees followed the procedures, perform the responsibilities and provide the reports set forth in the MSO Site Operations Manual, although *the MSO operator always maintained control over the daily work of its own employees*" (italics added);

(4) "ARS alone determined that Curry would be deemed an exempt employee, at which station(s) Curry would work, when she would work and what compensation and health and welfare benefits she should receive";

(5) "Any bonus paid to Curry while she was employed by ARS, however, was solely at the discretion of ARS";

(6) "During her employment with ARS, Curry received medical benefits from ARS and she received no employment benefits from [Shell]";

(7) "ARS alone made all hiring, disciplinary and promotional decisions with respect to Curry";

(8) "ARS alone approved salary increases for Curry after she was employed in August 2003";

(9) "Curry discussed any questions she had regarding her pay and her bonus payments only with her [ARS] Superiors"

16

(10) ARS alone set discipline guidelines for its own employees, including Curry"; and

(11) "ARS alone determined what duties Curry should perform based on operational demands, requirements of her station(s) and requirements imposed by the MSO Contract and MSO Lease. ARS alone also determined when Curry could take personal time off from work, when she could take vacations and when she could make up work time she missed."

In regard to wages and hours, ARS "was responsible for hiring, firing, disciplining, training, and compensating" Curry. This undisputed fact shows that ARS was responsible for Curry's wage. "ARS alone determined that Curry would be deemed an exempt employee, at which station(s) Curry would work, when she would work and what compensation and health and welfare benefits she should receive." This undisputed fact shows that ARS was responsible for the hours Curry worked and the wage she received. "ARS alone also determined when Curry could take personal time off from work, when she could take vacations and when she could make up work time she missed." This undisputed facts reflects ARS was responsible for determining Curry's work schedule. In sum, ARS had control over Curry's wages and hours.

In regard to Curry's working conditions, ARS "maintained the right and ability to assign any employee" to perform tasks. In other words, Shell could not direct Curry to perform a particular task, only ARS could do that. Further, ARS "maintained control over the daily work of its own employees." Thus, the tasks Curry was made to perform, and the conditions in which she performed them, were not controlled by Shell—they

17

were controlled by ARS. Accordingly, Shell has met its burden of establishing there is not a triable issue of fact concerning Shell being Curry's employer under the "wages, hours, or conditions" definition of employer.

The burden now shifts to Curry to establish there is a triable issue of fact concerning Shell being Curry's employer. Curry asserts the MSO Contract, the MSO Site Operations Manual, and the HSE Reference detail the tasks that Curry had to perform on a daily basis. Curry asserts, "The MSO Contract mandates that ARS must 'ensure' that its employees perform specific tasks. In order to comply with this mandate, *ARS directed Curry* to perform many of those tasks because she was the on-site manager with only one cashier on duty with her." (Italics added.)

The flaw in Curry's argument lies in the phrase "ARS directed Curry." We are examining whether Shell exercised control over Curry's wages, hours, or working conditions. Curry's argument reflects Shell exercised control over ARS, and, in turn, ARS exercised control over Curry, but Curry has not explained how Shell exercised control over Curry's wages, hours, or working conditions. Shell required particular tasks be performed by ARS, but did not mandate who or how many employees execute the tasks. For example, if Curry worked four hours a day, took her required 10 minute rest break, and a different ARS employee conducted the various tasks Shell required of ARS, there is nothing indicating Shell would have any input on that situation. There is not a triable issue of fact on the issue of Shell controlling Curry's working conditions.

Next, Curry contends Shell controlled her hours because Shell required the gas station to be open 24 hours a day, seven days a week, and required various tasks be

18

performed on a daily basis, thus, Curry could not take her required breaks and had to work overtime. Curry fails to explain how Shell exercised control over Curry, as opposed to ARS. As explained *ante*, if ARS staffed the gas station with five employees a shift, such that the various required tasks were completed by a variety of people, there is no evidence indicating Shell would have been authorized to change such an arrangement. In other words, Shell did not mandate that Curry perform the tasks; rather, Shell required that ARS complete the tasks, and ARS placed the burden on Curry. Thus, there is not a triable issue of fact on the issue of Shell controlling Curry's hours.

Next, Curry asserts there is a triable issue of fact as to whether Shell controlled Curry's wages. Curry points to evidence that Shell was required to reimburse ARS for the reasonable expenses related to ARS employees maintaining the fueling station. Shell unilaterally determined what amount was reasonable. This evidence does not reflect that Curry's wages were affected by the reimbursement. For example, it does not reflect Curry was paid less for a shift if the reimbursement amount was lower than ARS expected. Because Curry has not shown her wages were affected by Shell's reimbursement decisions, Curry has failed to show there is a triable issue of fact concerning Shell controlling Curry's wages.

Accordingly, we conclude Curry's causes of action fail under the "wages, hours, or conditions" definition of employer.

D.    SUFFER OR PERMIT TO WORK

We examine whether there is a triable issue of fact as to Shell being Curry's employer due to Shell suffering Curry or permitting Curry to work.  (Cal. Code Regs., tit. 8, § 11070, subd. (2)(D); *Martinez*, *supra*, 49 Cal.4th at p. 64.)  The language concerning an employer suffering or permitting a person to work was derived from a desire to prevent evasion from liability by a claim that a person was not employed in a traditional master/servant relationship.  (*Martinez*, at p. 58.)  The language arose from child labor laws.  For example, children under age 14 were not permitted to work.  Nevertheless, coal miners paid a boy to carry water for them and the boy sustained injuries while working.  The boy was not employed in a traditional sense by the mining company, but the mining company permitted or suffered the boy's work.  (*Id.* at p. 58, citing *Purtell v. Philadelphia & Reading Coal & Iron Co.* (1912) 256 Ill. 110, 111, 117.)  This definition has been interpreted to mean "the employer 'shall not . . . permit by acquiescence, nor suffer by a failure to hinder.' "  (*Martinez*, at p. 58, italics omitted.)  Put differently, "the basis of liability is the defendant's knowledge of and failure to prevent the work from occurring."  (*Id.* at p. 69, italics omitted.)

Accordingly, we examine if Shell met its burden of establishing there is no triable issue of fact as to whether Shell permitted or suffered Curry's work at the station.  The undisputed facts reflect, (1) "The *MSO operator was responsible* for hiring, firing, disciplining, training, compensating and maintaining payroll records for all employees working at the station"; and (2) "the MSO operator always maintained control over the daily work of its own employees."  (Italics added.)

20

The undisputed evidence reflects Curry's hiring, firing, and daily tasks were ARS's responsibility. Thus, Shell did not acquiesce to Curry's employment because Shell was not in a position to terminate Curry or hire a different person to perform the tasks Curry performed. In other words, Shell had no role to play—it could not hire Curry or terminate Curry's employment. Thus, Shell could not acquiesce to Curry's employment.

In regard to suffering by a failure to hinder, Shell had the authority to have Curry removed from the station upon "good cause shown." There is no evidence indicating what Shell may have cited as good cause for physically removing Curry from the station so as to prevent her from working her regularly scheduled shifts. Because the "good cause shown" clause was not triggered, Shell could not have Curry physically removed from the station. Thus, Shell did not have the ability to hinder Curry's work and, in turn, could not have failed to hinder Curry's work. In sum, Shell has met its burden of establishing there is not a triable issue of fact concerning Shell being Curry's employer based on the definition of suffering or permitting Curry to work.

We now examine whether Curry has met her burden of establishing there is a triable issue of material fact. Curry asserts "Shell caused her to suffer the non-payment of overtime by failing to 'hinder' ARS." Suffering concerns the alleged employer's failure to hinder the alleged employee's work by not stopping the alleged employee from working, e.g., not stopping the boy from carrying water to the coalminers. (*Martinez*, *supra*, 49 Cal.4th at pp. 58, 69-70 ["*failure to prevent* the work from occurring"].) It does not concern suffering by the employee due to the alleged failure to

21

pay wages owed.  Also it does not concern failing to hinder a third party, e.g., ARS. Accordingly, we conclude Curry has failed to meet her burden of establishing there is a triable issue of fact as to Shell being Curry's employer based upon the definition of suffering or permitting Curry to work.

Thus, we conclude Curry's causes of action fail under the "suffering or permitting" definition of employer.

E.     ENGAGE

We examine whether there is triable issue of fact concerning Shell being Curry's employer under the "to engage" definition of employer.

1.     *LAW*

"'[T]o engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship." (*Martinez*, *supra*, 49 Cal.4th at p. 64, fn. omitted.)  The common law test focuses on the issue of whether a worker is an employee or an independent contractor. (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 11.)

The essence of the common law employment test "is the 'control of details'— that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work—but there are a number of additional factors in the modern equation, including (1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities,

tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship.  [Citations.]  The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship."  (*Estrada v. FedEx Ground Package System, Inc.*, *supra*, 154 Cal.App.4th at p. 10.)

### 2.     *DISTINCT OCCUPATION OR BUSINESS*

The first factor is whether Curry engaged in a distinct occupation or business. Curry worked at two gas stations, one at Via Rancho and another at Carmel Mountain. The undisputed facts reflect, "As an ARS station manager, Curry supervised approximately five to seven ARS cashiers."  Thus, Curry was engaged in the distinct occupation of an ARS station manager.

### 3.     *SUPERVISED OR UNSUPERVISED*

The second factor is whether considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision.  "While employed by ARS, Curry reported to and took direction from ARS employees . . . and, at times, from the manager of the ARS HR department."  From this evidence it can be inferred that Curry's job was performed under the principal's direction.  In this case, the principal was ARS.  In regard to Shell providing direction to Curry, Shell required various tasks be performed by ARS; however, there is nothing

23

indicating that Shell required Curry be the person to perform those tasks. It was ARS that required Curry to perform certain tasks.

### 4. *SKILLS*

The third factor is the skill required for the work. Curry worked directly for Shell from May 2001 to March 2003. From March to July 2003, Curry worked "at a gas station." "In July, 2003, Curry was contacted [by an ARS employee] for the purpose of recruiting Curry to become the manager of the Via Rancho Station." It can be inferred from this evidence that skills are needed for managing a gas station. The evidence that Curry was recruited by ARS indicates a particular skill set was desired—ARS wanted a person with experience in the field.

The undisputed evidence reflects (1) "[Shell] never directed ARS to recruit, interview, hire, or promote any specific ARS employee"; and (2) "ARS alone determined what duties Curry should perform." Because Shell did not have input on the hiring process or Curry's job duties, it can be inferred that Shell did not require a particular skill sets because Shell did not have input on the tasks performed by a particular employee.

### 5. *INSTRUMENTALITIES, TOOLS, AND PLACE OF WORK*

The fourth factor is whether the principal or worker supplies the instrumentalities, tools, and place of work. Curry's job training was provided by ARS. ARS required Curry attend environmental compliance courses taught by Shell. ARS paid for Curry's time at the classes. Curry was required to wear a shirt and a nametag

that were purchased by ARS and given to Curry by ARS. Thus, ARS provided Curry with the information and uniform necessary to conduct her work.

Further, ARS operated the fueling facilities and leased the convenience stores and car wash facilities where Curry worked. Shell owned the fueling facilities. Thus, ARS and Shell provided Curry with a place to work—ARS provided the convenience store and car wash, while Shell provided the fueling station, i.e., the fueling islands. Shell also provided fuel and the fueling equipment, such as the fuel storage tanks. Curry's job duties included "many of the tasks set forth in the MSO Site Operations Manual, the CVP . . . Guide, and the [HSE Reference]." Therefore, it can be inferred that Curry's job duties involved tasks such as determining the amount of fuel in the storage tanks. As a result, Shell provided some of the equipment for Curry's job, in that Curry performed tasks related to Shell's fueling equipment.

6. *LENGTH OF TIME*

The fifth factor is the length of time for which the services are to be performed. The undisputed facts reflect "ARS alone determined that Curry would be deemed an exempt employee . . . [and] when she would work." Thus, ARS determined what shifts Curry would work. The undisputed facts reflect, "ARS alone made all hiring, disciplinary and promotional decisions with respect to Curry." Thus, Curry's hiring and any possible termination would be decided by ARS. The undisputed facts reflect, "ARS alone also determined when Curry could take personal time off from work, when she could take vacations and when she could make up work time she missed." Thus, ARS

decided when Curry could miss work. In sum, ARS decided the length of time for which Curry's work was to be performed.

Curry asserts Shell was able to determine the length of time Curry worked because Shell had the right to effectively terminate Curry. The MSO Contract provides, "Operator has the right to select, hire, and discharge such employees, provided, however, Operator shall remove any such employee promptly upon [Shell's] request for good cause shown. [Shell] shall not select, hire, discharge, supervise or instruct any of Operator's employees."

The MSO contract authorizes Shell to have ARS remove an ARS employee from a station, but does not permit Shell to terminate any ARS employee's employment. For example, if Shell requested Curry be permanently removed from its stations, then ARS could employ Curry in its offices or assign Curry the off-site task of driving around checking competing station's gas prices. The evidence cited by Curry does not create a triable issue of fact as to whether Shell could terminate Curry's employment because it does not indicate that Shell could terminate Curry's employment.

### 7. *PAYMENT*

The sixth factor is the method of payment, whether by time or by job. When ARS offered Curry the position of manager of the Via Rancho Station, it offered an annual salary of $32,000. Thus, Curry was a salaried employee of ARS; she was not paid a project. The undisputed facts reflect ARS "maintained exclusive control over all payroll" for Curry. Thus, Curry was not paid by Shell.

8.  *REGULAR BUSINESS*

The seventh factor is whether the work is part of the principal's regular business. "ARS operated approximately 15 gas stations San Diego County and employed over 100 people at those stations." Given this undisputed fact, it can reasonably be inferred that Curry's management of two gas stations was part of ARS's regular business because ARS's business involved operating gas stations.

Shell owned approximately 365 fueling stations in California. There is nothing indicating Shell employed people at the gas stations. Thus, Curry's work at the fueling station was not part of Shell's business. In other words, Shell was not in the business of operating fueling stations—it was in the business of owning real estate and fuel.

Curry contends "Shell was and is in the business of selling its motor fuel at facilities which it owns. . . . ARS merely provided the station employees and made sure that they performed their tasks in the manner in which Shell dictated." Curry's argument is problematic. If ARS supplied the employees and supervised the employees' work, then ARS was in the business of operating the station, and Shell was in the business of owning the station.

For example, if the owner of an apartment complex hires a property management company, and that property management company hires an on-site manager for the complex, the owner is not engaged in the business of property management. Rather, the owner is in the business of owning real estate, while the property management company is in the business of managing properties. Shell's contract with ARS did not put Shell in the business of operating fuel stations.

27

9.    *BELIEFS*

The eighth factor is whether the parties believe they are creating an employer-employee relationship. The undisputed facts reflect "Curry completed an Application for Employment with ARS" and "received, signed and returned to ARS a writing outlining her conditional offer of employment." These undisputed facts support the inference that Curry and ARS believed they were creating an employer-employee relationship.

In regard to Shell, when Curry met with the recruiter who recruited her to work at the Via Rancho station, Curry believed the recruiter was a Shell employee. However, at that recruitment meeting, "Curry completed an Application for Employment with ARS." The reasonable inference from these undisputed facts is that Curry initially believed at the recruitment meeting that she was being offered a job by Shell, but came to understand in the recruitment meeting that she was being offered a job by ARS, hence the ARS job application. Thus, the undisputed facts do not reflect Shell and Curry believed they created an employer-employee relationship.

10.    *CONCLUSION*

In sum, Shell, along with ARS, provided Curry a place to work and the equipment with which she performed her job. Providing a portion of Curry's work location and equipment is insufficient to raise a triable issue of material fact as to Shell being Curry's employer due to the many other factors reflecting Shell is not Curry's employer.

In other words, one could not reasonably conclude that Shell controlled the manner and means by which Curry accomplished her work because Shell did not supervise Curry, Shell did not have input on Curry's skills, Shell did not have control over the length of time Curry performed her job, Shell did not pay Curry, Shell was not in the business of operating service stations, and Shell and Curry did not believe they were creating an employer-employee relationship.  Accordingly, we conclude Curry's causes of action fail under the "to engage" definition of employer.

F.     CONCLUSION

In conclusion, Curry's three causes of action fail because there is not a triable issue of material fact concerning Shell being Curry's employer under any of the three legal definitions of employer.  The trial court properly granted summary judgment.

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION

MILLER
Acting P. J.


We concur:


CODRINGTON
J.


SLOUGH
J.

29