Filed 10/8/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BILLY R. HENDERSON,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>EQUILON ENTERPRISES, LLC,<br><br>      Defendant and Respondent. | A151626<br><br>(Contra Costa County<br>Super. Ct. No. MSC10-02259) |

Plaintiff and appellant Billy R. Henderson brought a civil action for wage and hour violations against defendant and respondent Equilon Enterprises, LLC, doing business as Shell Oil Products US (Shell), under a "joint employer" theory of liability. Henderson's causes of action consisted of failure to pay overtime compensation, failure to pay for missed break periods, and unfair business practices (Bus. & Prof. Code, § 17200). The trial court found Shell was not Henderson's joint employer and granted Shell's motion for summary judgment. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Procedural History*

Henderson commenced this lawsuit as a class action in July 2010. The trial court stayed the action under the common law doctrine of exclusive concurrent jurisdiction due to the earlier filing of a related class action lawsuit. In April 2016, Henderson filed a second amended complaint removing the class action allegations and stating individual claims for unpaid wages, statutory wage and record-keeping penalties and interest, as well as restitution, injunctive, and declaratory relief under Business and Professions Code section 17200 et seq. Henderson alleged he had been employed as the station manager of

several Shell-owned gasoline stations operated by Danville Petroleum, Inc. (Danville). He claimed he worked overtime and missed off-duty meal and rest breaks without receiving compensation. He further alleged that while he had been hired by Danville, Shell was liable as his "joint employer" because Shell "both directly and indirectly controlled the wages, hours or working conditions" of Danville's employees.

Shell moved for summary judgment, asserting it could not be held liable because Danville was Henderson's sole employer. (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 49 (*Martinez*) ["only an employer can be liable"].) Henderson settled his claims against Danville and opposed Shell's motion for summary judgment. After a hearing conducted on January 12, 2017, the trial court issued its opinion and order granting Shell's motion. Judgment in favor of Shell was entered on March 30, 2017. This appeal followed.

## B. Relevant Facts

As the parties acknowledge in their appellate briefs, the relevant facts are largely undisputed. Danville is a California corporation formed in 1997. Danville is a third-party service station operator. Henderson worked as a station manager for Danville from approximately 1998 to 2008, when he was fired following an accusation of sexual harassment. Henderson managed as many as seven of Danville's Shell-branded gas stations between 2001 through 2008. During this time, he was never directly employed by Shell.

Prior to August 2003, Danville operated Shell-branded service stations as a franchisee under a Contractor Operated Retail Outlet (CORO) Agreement.[1] Under these franchise agreements, third-party operators like Danville ran convenience stores and/or car washes at Shell-branded gas stations, retaining the proceeds from those activities while selling fuel for Shell. Shell charged the operators a royalty on convenience store sales and paid the operator a set fee for each gallon of gasoline sold.

In 2003, Shell discontinued the CORO program and adopted a Multi-Site Operator (MSO Agreement) structure. Under the MSO Agreement, Shell supplied the stations

---

[1] Henderson worked as the manager at two of these CORO stations.

with fuel products and set fuel prices. Danville facilitated the collection of customer payments for fuel purchases and the transmission of these payments to Shell. Shell compensated Danville for this service and reimbursed Danville for certain expenses. In connection with the fuel sale business, Danville also agreed to survey and report the fuel prices charged by competitors, change fuel prices as directed by Shell, keep the station open for specified hours, use specified equipment for recording and reporting all sale transactions to Shell, and abide by certain standards to protect the Shell brand. From August 2003 to 2008, Danville operated as many as 39 gas stations for Shell under an MSO Agreement, employing hundreds of people at those stations.

Danville and Shell also entered into a Multi-Site Non-Petroleum Facility Lease (MSO Lease) in connection with the operation of convenience stores, car washes, and quick service restaurants on Shell gas station sites. Under the MSO Lease, Danville operated these endeavors for its own benefit and was responsible for most of the associated expenses. Danville paid Shell a monthly rent for the leased facilities. The MSO Agreement and MSO Lease expressly disclaim any franchise relationship between Danville and Shell.

The MSO Agreement required Danville to comply with all applicable employment laws. Danville alone made decisions with respect to recruiting, interviewing, hiring, disciplining, promoting and terminating its employees. Danville had sole control over employee payroll functions, including whether employees would be deemed exempt from overtime regulations. Danville had its own employee handbook and set its own meal and break policies. Shell retained the right to ask Danville to "remove" an employee from a Shell-owned station "for good cause shown," but the MSO Agreement provided that Danville had sole authority to terminate its employees.[2]

The MSO Agreement also required Danville to operate gas stations in conformity with Shell's operational standards. Shell provided Danville with station operation manuals, including the MSO Site Operations Manual (MSO Manual), the Enhanced

_____

[2] Shell never asked for any Danville employee to be removed.

3

Customer Value Proposition Reference Guide (CVP Reference Guide), and the Health, Safety and Environmental Reference Manual (Blue Book). Danville directed its employees as to how to comply with the provisions of these manuals, and the record indicates that Danville never required Henderson to read the MSO Manual. While the standards in these manuals appear extensive, the CVP Reference Guide specifies, among other things, that Danville "may use different methods [or] frequencies [than] those recommended here."

Both Danville and Shell conducted station inspections. Shell's inspections were referred to as "CVP inspections." Shell's representatives would give their inspection reports to Danville, and Danville would discuss any concerns with Henderson. Shell's representatives did not directly tell Henderson or other station employees how to perform their work. Danville performed its own audits of the convenience stores managed by Henderson. Henderson was instructed by Danville to contact Danville representatives for any questions about operating his stations. Shell was not involved in the decision to terminate Henderson's employment.

## DISCUSSION

### I.  *Standard of Review*

The standard for reviewing a grant of summary judgment is well established. Summary judgment is appropriate if "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To meet its initial burden in moving for summary judgment, a defendant must present evidence that either "conclusively negate[s] an element of the plaintiff's cause of action" or "show[s] that the plaintiff does not possess, and cannot reasonably obtain," evidence necessary to establish at least one element of the cause of action. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853–854.) Once the defendant satisfies its initial burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) When considering an appeal from a grant of summary judgment, we independently review the record, "liberally construing

4

the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)

## II. *Joint Employment Relationships in Wage and Hour Claims*

Henderson's wage and hour claims are based on the Industrial Welfare Commission's (IWC) wage order No. 7-2001 (Cal. Code Regs., tit. 8, § 11070 (Wage Order No. 7).) Wage Order No. 7 defines "Employer" as a person or business "who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11070, subd. 2(F).) An "Employee" is defined as "any person employed by an employer." (*Id.*, subd. 2(E).) "Employ" is defined as "engag[ing], suffer[ing], or permit[ting] to work." (*Id.*, subd. 2(D).)

In *Martinez*, the Supreme Court evaluated wage and hour claims brought by seasonal agricultural workers against a farmer who was their direct employer and two of the produce merchants through whom the farmer sold his strawberries. (*Martinez*, *supra*, 49 Cal.4th at p. 48.) The plaintiffs' suit was predicated on a theory that both the farmer and the produce merchants were their joint employers. The plaintiffs argued that in an action for unpaid and overtime wages under Labor Code section 1194, the court should look to the alternative definitions of "employ" and "employer" as set forth in IWC Wage Order No. 14 to determine who is a potentially liable employer. (*Martinez*, at p. 51). The Supreme Court examined "the question of how employment should be defined" and concluded "the IWC's wage orders do generally define the employment relationship, and thus who may be liable." (*Martinez*, at pp. 50, 52.) The court held: "To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours, or working conditions [taken from the IWC definition of 'employer'], *or* (b) to suffer or permit to work [taken from the IWC definition of 'employ'], *or* (c) to engage," which the court construed as the common law definition of an employment relationship. (*Id.* at p. 64.) The Court concluded the produce merchants

5

could not properly be found to be an employer under any of the alternative definitions of employment found in the wage order. (*Id.* at pp. 68–77.)

In examining the first definition of an employment relationship—exercising control over wages, hours, or working conditions—the *Martinez* court recognized that the produce merchants could leverage their business relationship to influence the farmer. (*Martinez, supra*, 49 Cal.4th at pp. 72, 74–75.) However, while the merchant's representatives would explain to the agricultural workers "how the merchant wanted strawberries packed," would "check the packed containers as workers brought them from the field," and "would also sometimes speak directly to the workers, pointing out mistakes in packing such as green and rotten berries," these interactions were insufficient to establish that the merchants exercised control over the plaintiffs' working conditions. No evidence suggested that the farm workers viewed the merchants' representatives as their supervisors, and the farmer's contracts with the produce merchants gave the merchants no right to direct the farmers' employees. (*Id.* at pp. 76–77.) And while the produce merchants paid the farmer an advance, that fact alone was not sufficient to establish that the produce merchants controlled the workers' wages and were the workers' employers. (*Id.* at pp. 72, 74–75.)

Under the second definition—"to suffer or permit to work"—"the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." (*Martinez, supra*, 49 Cal.4th at p. 70.)[3] No employment relationship was found under this test because while the produce merchants were undoubtedly aware that the farmer used laborers to satisfy his contracts, the produce merchants had no authority to prevent such work from occurring. "Neither [produce merchant] suffered or permitted plaintiffs

---

[3] As the *Martinez* court explained, the IWC language concerning an employer suffering or permitting a person to work was derived from child labor laws and was intended to impose civil or criminal liability for injuries sustained by children in a work setting even when no common law employment relationship existed between the minor and the defendant. (*Martinez, supra*, 49 Cal. 4th at p. 58 ["Not requiring a common law master and servant relationship, the widely used 'employ, suffer or permit' standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity."])

to work because neither had the power to prevent plaintiffs from working. [The farmer] and his foremen had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work." (*Id.* at p. 70.) That the produce merchants derived a benefit from the plaintiffs' labor was insufficient to make them employers, for under such a broad standard the grocer who purchases the strawberries from the defendants or the consumer who buys strawberries at the grocery store could conceivably become employers under this theory of liability. (*Ibid.*)

Finally, under the third IWC definition—"to engage"—the *Martinez* court concluded no common law employment relationship existed between the plaintiffs and the produce merchants. " '[T]he principal test of [a common law] employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " ( *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*); see *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533 (*Ayala*) ["Whether a right of control exists may be measured by asking ' " 'whether or not, if instructions were given, they would have to be obeyed' " ' on pain of at-will ' " 'discharge[] for disobedience.' " ' " The plaintiffs in *Martinez* asserted that the produce merchants were joint employers by virtue of the control they exercised over the quality of the produce picked and packaged by the agricultural workers. In rejecting plaintiffs' quality-control theory, the *Martinez* court noted that the farmer alone decided which fields to harvest on any given day, he alone had the power to hire and fire his workers, and no evidence suggested that the produce merchants ever supervised or exercised control over his employees. (*Martinez*, *supra*, 49 Cal.4th at pp. 70, 72, 76–77.)

### III. *No Triable Issues of Material Fact Demonstrate an Employment Relationship Between Plaintiff and Shell*

Our analysis in the present case is greatly informed by *Curry v. Equilon Enterprises, LLC* (2018) 23 Cal.App.5th 289 (*Curry*), an opinion recently issued by our colleagues in Division Two of the Fourth District Court of Appeal. In *Curry,* the plaintiff brought a class action suit against Shell asserting the same claims as the ones presented

7

here: failure to pay overtime compensation, failure to pay for missed break periods, and unfair business practices. (*Id.* at pp. 292–293.) *Curry* involved the same MSO Agreement at issue here, and the named plaintiff in that case, like Henderson, was a station manager hired by a third-party operator (identified as "ARS") to manage a Shell-branded gas station. (*Id.* at pp. 293–295.) Like Henderson, the plaintiff in *Curry* alleged that Shell was her joint employer. (*Id*. at p. 296.)

Shell moved for summary judgment, contending it did not have an employment relationship with the plaintiff. As here, Shell argued that while ARS and Shell were in a contractual relationship, ARS alone managed and controlled " 'every aspect of its employment relationship with its gas station employees . . . .' " (*Curry*, *supra*, 23 Cal.App.5th at p. 297.) In opposing summary judgment, the plaintiff asserted a reasonable jury could find that Shell was her joint employer because it "mandates how [the fuel business] will be operated primarily by service station employees . . . ." (*Id*. at p. 298.) The trial court granted Shell's motion, finding that Shell was not Curry's employer, either solely or jointly. (*Id.* at p. 299.)

The Court of Appeal affirmed, concluding no triable issues of fact were presented demonstrating a joint employer relationship between Shell and the plaintiff under any of the definitions set forth in *Martinez.* Addressing the first prong of the *Martinez* test, the *Curry* court first considered whether any triable issues had been raised as to whether Shell exercised control over the plaintiff's wages, hours, or working conditions. (*Curry*, *supra*, 23 Cal.App.5th at p. 301.) Answering in the negative, the court concluded that ARS had sole control over the plaintiff's wages and hours because it " 'was responsible for hiring, firing, disciplining, training, and compensating' " her, and "was responsible for determining her work schedule." (*Id.* at pp. 302–303.) The undisputed facts also showed that ARS was solely responsible for the plaintiff's working conditions because only ARS could "direct [the plaintiff] to perform a particular task" and only ARS "maintained control over the daily work of its own employees." (*Id*. at p. 303.)

The *Curry* court rejected plaintiff's assertion that the MSO Agreement and Shell's various operating manuals detailing her daily tasks created a triable issue of fact. While

Shell exercised control over ARS, and ARS exercised control over the plaintiff, the plaintiff did not explain how Shell exercised control over her own working conditions. (*Curry*, *supra*, 23 Cal.App.5th at p. 303.) The court observed that while Shell required certain tasks to be performed by ARS under the contract, it "did not mandate who or how many employees execute the tasks." While Shell required, for example, that the gas station managed by plaintiff be open 24 hours a day, seven days a week, Shell did not control how many employees ARS used to staff the station. (*Id*. at pp. 303–304.) In addition, Shell had no control over the plaintiff's wages because there was no evidence that her wages were affected by reimbursements Shell made to ARS for its reasonable expenses related to maintenance of the fueling station. (*Id.* at p. 304.)

Henderson, whose counsel is the same attorney that represented the plaintiff in *Curry*, raises essentially the same arguments in the instant appeal. He contends Shell exercised control over his working conditions because the MSO Agreement required Danville to " 'ensure' " that its employees perform specific tasks and Danville directed Henderson to perform many of those tasks because he "was the on-site manager with generally only one cashier on duty with him." Shell allegedly controlled Henderson's hours because the MSO Agreement required "all of Danville's assigned stations to be open 24/7/365. This requirement alone required Henderson to cover shifts when a cashier was missing." Henderson also contends he was required to be at work every morning Monday through Saturday to perform the gas survey, complete mandatory fuel sales reports and make bank deposits for the benefit of Shell's motor fuel business. As to Shell's control over his wages, he states, "While Shell did not set each employee's compensation, Shell unilaterally determined how much it would reimburse Danville for all motor fuel related labor."

We reject these contentions for the same reasons explained in *Curry*. The record is undisputed that Danville alone set Henderson's wages, determined which employees would be deemed exempt from overtime regulations, and was solely responsible for Danville's payroll function and compliance with labor laws. Danville alone set its meal and rest break policies, enforced its own employee handbook, and determined

9

Henderson's work schedule and the number of employees who worked at a particular station. That Danville may have understaffed its service stations, requiring Henderson to cover shifts for other employees and work longer hours, are working conditions that Danville created and Shell had no contractual authority to control or alter. Danville alone dictated the day-to-day tasks Henderson was required to perform and the conditions under which he performed them. Henderson's contention that Shell's reimbursement of reasonable expenses amounted to indirect control of his wages is equally unavailing. No evidence was presented that Henderson's wages were affected by or connected to the reimbursement amounts set by Shell. The evidence does not reflect, for example, that Henderson was paid less for a shift if the reimbursement amount came in lower than expected. (See *Curry*, *supra*, 23 Cal.App.5th at p. 304.) In short, while Danville was required by Shell to perform certain tasks under the MSO Agreement, Danville alone dictated how those tasks would be performed by its employees and controlled the day-to-day operations of the service stations. We conclude Henderson has failed to raise a triable issue of fact concerning Shell's ability to control his wages, hours, or conditions of employment, and Shell is therefore entitled to judgment as a matter of law as to all claims based upon the IWC's definition of an "employer."

Under the second *Martinez* test for joint employment, whether Shell suffered or permitted Henderson to work, the *Curry* court explained this test "was derived from a desire to prevent evasion from liability by a claim that a person was not employed in a traditional master/servant relationship." (*Curry*, *supra*, 23 Cal.App.5th at pp. 310–311.) The definition has been interpreted to mean " 'the employer "shall not . . . permit by acquiescence, nor suffer by a failure to hinder." ' " (*Id*. at p. 311.) The *Curry* court concluded "the undisputed evidence reflects [the plaintiff's] hiring, firing, and daily tasks were ARS's responsibility. Thus, Shell did not acquiesce to [the plaintiff's] employment because Shell was not in a position to terminate [her] or hire a different person to perform the tasks [she] performed." (*Id.* at p. 311.)

We find *Curry's* analysis of this test dispositive of the question before us. The MSO Agreement provides that Danville had the exclusive right to recruit, interview,

10

train, hire, discipline, promote, and terminate its employees, and Danville maintained control over their daily work activities. While Shell retained the right to ask Danville to "remove" an employee from a Shell-owned station "for good cause shown," Henderson does not dispute that Shell had no right to fire him. As the trial court below found, "[r]emoval cannot be synonymous with discharge when the subsequent sentence [in the MSO Agreement] provides that Shell "shall *not* select, hire, *discharge,* supervise, or instruct any of [Danville]'s employees." (Italics added.) Shell cannot have acquiesced to Henderson's employment because Shell had no power to fire plaintiff, hire his replacement, or prevent him from working for Danville. (See *Curry*, *supra*, 23 Cal.App.5th at p. 311; *Martinez*, *supra*, 49 Cal.4th at p. 70.)

Nor has Henderson raised a triable issue of material fact with respect to whether Shell suffered Henderson's employment by failure to hinder. As the *Curry* court observed, Shell never exercised the option to remove an ARS employee from a service station and has not evoked the "good cause" that must precede any such removal. (*Curry*, *supra*, 23 Cal.5th at p. 311.) The same applies with respect to any Danville employee. Because Shell has not established the good cause required to remove Henderson from a service station, it had no power to hinder his work, and, by extension, could not have failed to hinder his work.

Henderson contends the IWC's "suffer or permit" definition is applicable because Shell failed to keep the claimed violations—unpaid overtime and missed meal and rest break compensation—from occurring. He misapprehends this test. The "suffer or permit" test does not concern whether the alleged joint employer failed to hinder or acquiesced to a violation. As discussed *ante*, the test concerns an alleged employer's failure to hinder the alleged employee's *work* by failing to prevent the work from occurring. (*Martinez, supra*, 49 Cal. 4th at pp. 69–70.) Because Shell had no role in either allowing or preventing Henderson from working for Danville, we conclude Henderson's causes of action fail under the "suffer or permit" definition of employment.

Under the third *Martinez* test, which concerns whether Shell was the plaintiff's employer under the common law definition of employment, the *Curry* court explained

11

that the "essence of the common law employment test " 'is the "control of details"—that is, whether the principal has the right to control the manner and means by which the worker accomplishes the work,' " along with eight other secondary factors.[4] (*Curry*, *supra*, 23 Cal.App.5th at pp. 304–305.) After a detailed analysis of all the factors, the court concluded that while Shell, along with ARS, had provided the plaintiff with a place to work and the equipment with which she performed her job, "one could not reasonably conclude that Shell controlled the manner and means by which Curry accomplished her work" (*id.* at p. 308) because none of the other factors applied. (*Id.* at pp. 304–308.) Undisputed facts showing the absence of a common law employment relationship included the following: (1) while Shell required various tasks to be performed by ARS, "there is nothing indicating that Shell required [the plaintiff] to be the person to perform those tasks" (*id*. at p. 305), (2) "Shell did not have input on the hiring process or [the plaintiff's] job duties" (*ibid.*), (3) while Shell could request that an employee be removed from a station, Shell could not terminate the plaintiff's employment (*id.* at pp. 306–307), (4) the plaintiff was not paid by Shell (*id*. at p. 307), and (5) unlike ARS, Shell was not in the business of operating fueling stations; instead it was in the business of owning gas stations (*id*. at pp. 307–308).

Henderson does not point to any record evidence that distinguishes this case from *Curry* or persuades us to depart from the Court of Appeal's reasoned analysis. Shell

---

[4] These factors are: " '(1) whether the worker is engaged in a distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship. [Citations.] The parties' label is not dispositive and will be ignored if their actual conduct establishes a different relationship.' " (*Curry*, *supra*, 23 Cal.App.5th at pp. 304–305.) This multifactor test was first articulated in *Borello, supra*, 48 Cal.3d at pages 350–351. The significance of these factors will vary, and certain factors, such as the " 'ownership of the instrumentalities and tools' of the job" (*Ayala*, *supra*, 59 Cal.4th at p. 539), may take on less importance in an overall evaluation of the right to control. (See *id.* at p. 540.)

12

required Danville to perform certain tasks under the MSO Agreement and MSO Lease but left the execution of those tasks to Danville, and neither contract gave Shell authority to hire, fire or direct the work of Danville's employees. (See *Ayala*, *supra*, 59 Cal.4th at p. 531 ["the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities' "], quoting *Malloy v. Fong* (1951) 37 Cal.2d 356, 370.) Although Shell supplied detailed station operation manuals, including the MSO Manual, the CVP Reference Guide, and the Blue Book, Danville was responsible for directing its employees' compliance with these manuals. Indeed, Danville never required Henderson to read the MSO Manual. And while both Shell and Danville conducted station inspections and audits, Shell's inspection reports were delivered directly to Danville—Shell had no formal communications with Henderson or other Danville employees. (Compare *Martinez*, *supra*, 49 Cal.4th pp. 75–76 [direct input from merchant representatives to plaintiffs concerning the quality and packaging of produce did not establish a supervisory or control relationship with farm worker plaintiffs].)

The *Curry* court distinguished two cases relied on here by Henderson, *RWJ Cos. v. Equilon Enters., LLC* (S.D.Ind., Dec. 28, 2005, Civ. A. No. 1:05-cv-1394-DFH-TAB) 2005 U.S.Dist. Lexis 38329, an unpublished federal court case from Indiana, and *Castaneda v. The Ensign Group, Inc.* (2014) 229 Cal.App.4th 1015 (*Castaneda*). As the *Curry* court noted, the *RWJ* case involved whether the MSO Agreement amounts to a franchise agreement. (*Curry*, *supra*, 23 Cal.App.5th at p. 309.) In its analysis, the federal district court stated: " 'The evidence in this case shows that Shell retained extensive control over the marketing of fuel and every aspect of the filling station operation, as well as substantial control over the marketing of convenience store products and services. When reading cases addressing this issue, it is important to recognize that RWJ operates only Shell-branded filling stations and that RWJ's convenience stores are associated very closely with both the filling station operations and the Shell brand.' " (*Curry*, at p. 309.) The *Curry* court properly found the case inapposite, as the issue in

13

*RWJ* was whether the RWJ contract with Shell was a franchise agreement by virtue of the control Shell exercised over RWJ—not the *employees* of RWJ. (*Curry*, at p. 309.)[5]

In *Castaneda*, an employee filed a class action suit alleging the defendant corporation was the alter ego of a rehabilitation center owned by the defendant and asserting its corporate veil should be pierced. (*Castaneda*, *supra*, 229 Cal.App.4th at p. 1020.) Among other factors distinguishing *Castaneda* from *Curry*, the corporation owned the plaintiff's employer, set the rate of pay for its employees, and administered the employee benefits. (*Curry*, *supra*, 23 Cal.App.5th at p. 310.) Because those facts are not present here, we agree that *Castaneda* does not support the argument Henderson now advances.

Henderson also argues that the trial court failed to address the CORO station structure that was in place prior to August 2003. Under this business arrangement, Shell and Danville shared the revenue generated by the station, with Shell providing the motor fuel and Danville providing the products sold in the convenience stores. Henderson contends a triable issue exists whether the CORO structure amounted to a partnership between Danville and Shell. Henderson failed to present this issue before the trial court below. As Shell points out, Henderson never pleaded a partnership theory, adduced no evidence of a partnership between Shell and Danville, and failed to develop any such

---

[5] While the MSO Agreement replaced the CORO franchise agreement, the MSO Agreement retained many of the attributes of the franchise agreement, including Shell providing Danville with detailed manuals concerning the dispensing and sale of gasoline, signage, and condition and maintenance of the property. Henderson places considerable emphasis on these manuals in arguing Shell exercised control over his employment. We note, however, that in *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, our Supreme Court held that a franchisor that supplied these same kinds of operations manuals did not thereby become the joint employer of the franchisee's employees and therefore was not liable for the franchisee's alleged violations under the Fair Employment and Housing Act (FEHA), specifically for alleged sexual harassment by a supervising employee of the franchisee. (*Patterson v. Domino's Pizza, LLC*, at p. 501.) Like the wage and hour laws, FEHA provides important employee protections in the workplace. Thus, the high court's conclusion that the attributes of a franchise agreement, and particularly the kinds of controls aimed at protecting a brand, do not create a joint employer relationship, appears apt in the present context, as well.

14

argument in opposing Shell's motion for summary judgment. Rather, Henderson hangs his hat on an evidentiary objection to a supplemental declaration filed by one of the defendants. We decline to take up a partnership theory of liability for the first time on appeal when the gravamen of plaintiff's claims has been joint employer liability. The argument is forfeited. (*North Coast Business Park v. Nielsen Construction Co*. (1993) 17 Cal.App.4th 22, 28–29 [" 'A party is not permitted to change [its] position and adopt a new and different theory on appeal. To permit [it] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party.' "]).

## IV. *Applicability of* **Dynamex** *to Claims of Joint Employer Liability*

While briefing was underway in this appeal, the California Supreme Court issued its opinion in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*). *Dynamex* examined what legal standard should apply to resolve whether a worker has been properly classified as an independent contractor or employee. Drawing from the "suffer or permit to work" test articulated in *Martinez* (see *ante* at p. 7), the *Dynamex* court adopted the "ABC" test to address claims of worker misclassification. (*Dynamex*, at pp. 958–963.) Henderson urges us to apply the ABC test and contends that under such test, Shell cannot establish that Henderson was not its employee. For the reasons explained below, we conclude that the ABC test in *Dynamex* does not fit analytically with and was not intended to apply to claims of joint employer liability.

In *Dynamex*, a putative class of delivery drivers brought suit against Dynamex Operations West, Inc. (Dynamex), a nationwide package and document delivery company. (*Dynamex*, *supra*, 4 Cal.5th at p. 914.) The plaintiffs alleged that Dynamex had misclassified them as independent contractors and such misclassification allowed Dynamex to circumvent the requirements of IWC wage order No. 9 and other provisions of the Labor Code pertaining to employers. (*Dynamex*, at p. 914.) The drivers argued that in analyzing whether an employment relationship had been established with Dynamex, the trial court should apply the three alternative definitions of employment set forth in the applicable wage order, consistent with *Martinez*. (*Dynamex*, at p. 914.) Dynamex countered that the wage order definitions in *Martinez* are relevant only to joint

15

employer claims, and the applicable standard for distinguishing employees from independent contractors is the multifactor common law employment test described in *Borello*. (*Dynamex*, at p. 915; see *ante*, at p. 12 & fn. 4.) Siding with the plaintiffs, the trial court found that common issues about the employment relationship predominated and certified the class. (*Dynamex*, at p. 915.)

Following an unsuccessful motion to decertify the class, Dynamex petitioned for writ of mandate at the Court of Appeal. The Court of Appeal rejected Dynamex's contention that two of the three definitions of employment under the wage order are relevant only to joint employment issues. The court concluded instead that all three definitions discussed in *Martinez* may be applied to determine whether a worker is an employee covered under the wage order or is an independent contractor. (*Dynamex*, *supra*, 4 Cal.5th at p. 915.) The Supreme Court granted review to consider whether the definitions of "employer" and "employ"—the first and second *Martinez* tests—are applicable to determine whether a worker is properly classified as an employee or independent contractor for purposes of compliance with the IWC wage order. (*Id.* at p. 916.)

The Supreme Court concluded that the "suffer or permit to work" definition of "employ" under the applicable wage order may be relied upon to evaluate claims that workers have been misclassified as independent contractors. As *Martinez* explained, the suffer or permit to work standard was established by wage order over a century ago and has its roots in addressing irregular working arrangements and child labor cases, not simply joint employer claims. (*Dynamex, supra,* 4 Cal.5th at pp. 944–945, citing *Martinez, supra*, 49 Cal.4th at pp. 57–58.) A broad application of the suffer or permit to work standard is justified as well by the history and remedial purpose of the wage orders and other social legislation intended to protect the health and welfare of workers, provide industrywide fair labor practices for law-abiding businesses, and ensure that the costs of substandard wages and unsafe working conditions are not borne unnecessarily by the public. (*Dynamex*, at pp. 952–953.) The high court recognized that a literal application of the suffer or permit to work standard would characterize *all* individual workers who

16

directly provide services to a business as employees, encompassing even those individuals who traditionally serve as independent businesses, such as plumbers and electricians. (*Id.* at p. 949.) The court thus adopted the "ABC" test to distinguish covered employees from traditional independent contractors who would not reasonably have been viewed as working in the hiring entity's business.

The court explained: "The ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfied *each* of three conditions: (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." (*Dynamex*, *supra*, 4 Cal. 5th at pp. 955–956.) The hiring entity's failure to prove any one of these three elements will be sufficient to establish that the worker is an employee, and not an independent contractor, covered under the relevant wage order. (*Id.* at p. 964.)

Part A of the ABC test is concerned with whether a worker is subject to the type and degree of control a business typically exercises over an employee, the equivalent of a common law employment relationship predicated on the principal's right to control how the end results are achieved. (*Dynamex*, *supra*, 4 Cal.5th at pp. 958, citing *Borello*, *supra*, 48 Cal.3d at pp. 353–354, 356–357.)[6] Part B asks whether the worker is engaged in services that would ordinarily be viewed as part of the hiring entity's usual business operations. (*Id.* at p. 959.) When a worker provides services which are comparable to work performed by the hiring entity's employees or which align with and further the

---

[6] As discussed *ante*, no evidence was presented demonstrating that Shell had a right to control Danville's employees in any way, and certainly no evidence that Shell could terminate or discipline Danville's employees if its instructions were not followed. The existence of Shell-provided operations manuals, without more, does not suffice to create a joint employer relationship with appellant. (See *ante*, p. 14, fn. 5.)

hiring entity's operations, "the hiring business can reasonably be viewed as having suffered or permitted the workers to provide services as employees." (*Id.* at p. 960.) Part C asks the related question whether the independent contractor is an "individual who *independently* has made the decision to go into business for himself or herself." (*Id*. at p. 962.) This test starts from the premise that a business may not evade the prohibitions or responsibilities of being an employer by unilaterally determining a worker's status as "independent contractor" or by "requiring the worker, as a condition of hiring, to enter into a contract that designates the worker an independent contractor." (*Ibid*.) Part C therefore requires inquiry into whether the worker has taken steps to establish and promote his or her independent business, such as through licensing, incorporation, advertisements, the existence of multiple customers, and other related indicia of self-employment. (*Ibid*.)

At bottom, *Dynamex* was concerned with the problem of businesses misclassifying workers as independent contractors so that the business may obtain economic advantages that result from the avoidance of legal and economic obligations imposed on an employer by the wage order and other state and federal requirements. "[T]he risk that workers who should be treated as employees may be improperly misclassified as independent contractors is significant in light of the potentially substantial economic incentives that a business may have in mischaracterizing some workers as independent contractors. Such incentives include the unfair competitive advantage the business may obtain over competitors that properly classify similar workers as employees and that thereby assume the fiscal and other responsibilities and burdens that an employer owes to its employees. In recent years, the relevant regulatory agencies of both the federal and state governments have declared that the misclassification of workers as independent contractors rather than employees is a very serious problem, depriving federal and state governments of billions of dollars in tax revenue and millions of workers of the labor law protections to which they are entitled." (*Dynamex*, *supra*, 4 Cal.5th at p. 913.)

Those policy concerns are not present in the instant appeal, or more broadly, in wage and hour claims arising under a joint employer theory of liability. In a joint

18

employer claim, the worker is an admitted employee of a primary employer, and is subject to the protection of applicable labor laws and wage orders. The distinct question posed in such claims is whether "another business or entity that has some relationship with the primary employer should properly be considered a joint employer of the worker and therefore also responsible, along with the primary employer, for the obligations imposed by the wage order." (*Dynamex*, *supra*, 4 Cal.5th at p. 915.) Joint employer claims raise different concerns, such as when the primary employer is unwilling or no longer able to satisfy claims of unpaid wages and workers must look to another business entity that may be separately liable as their employer. (See *Martinez*, *supra*, 49 Cal.4th at pp. 47–48 [claims asserted against putative joint employers after primary employer defaulted on payment of back wages and statutory penalties]; *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912, 928 [federal and state wage and hour claims asserted against county for unpaid in-home supportive services under theory that county's exercise of control over administration of program rendered it a joint employer].) Given the substantial differences animating these policy concerns, we see no reason to depart from the well-established framework for analyzing the joint employment relationship under *Martinez*.[7]

Further underscoring our conclusion that the *Dynamex* ABC test was not intended to apply to joint employer claims is that parts B and C of the ABC test do not fit analytically with such claims. Part B probes whether a worker is rendering services that would ordinarily be seen as part of the hiring entity's usual business operations because

_____

[7] The *Curry* court similarly concluded that the ABC test in *Dynamex* was not intended to apply in joint employment cases. "[T]he Supreme Court's policy reasons for selecting the 'ABC' test are uniquely relevant to the issue of allegedly misclassified independent contractors." (*Curry*, *supra*, 23 Cal.App.5th at p. 314.) In the "joint employment context, the alleged employee is already considered an employee of the primary employer; the issue is whether the employee is also an employee of the alleged secondary employer." (*Ibid*.) The *Curry* court reasoned that "the 'ABC' test set forth in *Dynamex* is directed toward the issue of whether employees were misclassified as independent contractors. Placing the burden on the alleged employer to prove that the worker is not an employee is meant to serve policy goals that are not relevant in the joint employment context." (*Ibid.*)

such activity would indicate that the worker is in actuality a misclassified employee. But a worker whose primary employer has a contractual relationship with another business entity is in a different situation. As an existing employee, he or she already performs work that furthers the interests of the primary employer and is protected under wage and hour laws. Thus, asking whether that employee's work is "outside the usual course of business" of a secondary employer makes little sense if one wants to determine whether the secondary employer has suffered or permitted the employee to work for them. The relevant inquiry is instead whether the secondary entity has the power to control the details of the employee's working conditions, or indeed, the power to prevent the work from occurring in the first place. (See *Martinez*, *supra*, 49 Cal.4th at p. 70.) As a practical matter, applying Part B to claims of joint employer liability might result in the end of many service contracts or other joint venture agreements between two business entities that happen to be in the same line of work (unless one business is willing to oversee the human resources and payroll departments of the other company). We do not believe that was the intended effect of *Dynamex*.[8]

Trying to apply Part C of the ABC test to joint employer claims recalls the proverbial square peg in a round hole. The basic premise of a joint employer claim is that the plaintiff is already employed by a primary employer and is seeking to establish that another business entity is separately responsible for obligations imposed under the wage order and other requirements. The primary thrust of Part C, on the other hand, is to determine whether the plaintiff is an independent contractor who has chosen the burdens

---

[8] In an abundance of caution, the *Curry* court applied the ABC test and concluded that no triable issues of fact demonstrated an employment relationship between Shell and the plaintiff under those factors. With respect to Part B, the court found that Shell was not in the business of operating fuel stations but was instead in the business of owning real estate and fuel. (*Curry*, *supra*, 23 Cal.App.5th at p. 315.) We believe appellant has the better of the argument and that Shell is in the business of furnishing and selling fuel to retail customers—the same or similar work performed by appellant. But as discussed *ante*, this similarity should not, by itself, transform Shell into appellant's joint employer in the absence of any evidence that Shell has the right to exercise control over appellant's wages, hours, or conditions of employment.

and benefits of *self-employment*.  (*Dynamex*, *supra*, 4 Cal.5th at p. 962.)  The factors relevant to Part C, whether the worker has taken steps to establish his or her independent business, have no application in the instant appeal because appellant elected to work for his primary employer, Danville, and had no reason to establish an independent occupation or trade.  The same circumstance would seem to apply to many, if not most, joint employer wage and hour claims.  A literal application of Part C in the context of joint employment questions would result in the absurdity that a secondary business entity is deemed a joint employer merely *because* the plaintiff is already employed by the primary employer.  We conclude the *Dynamex* ABC test does not apply in the joint employment context, and the governing standard is found in *Martinez*.

## CONCLUSION

Appellant Henderson has not presented any triable issues of fact demonstrating the existence of a joint employment relationship between Shell and appellant under the three alternative definitions of employment set forth in Wage Order No. 7.  *Dynamex* does not alter our conclusion because the ABC test was adopted to address claims that workers have been misclassified as independent contractors rather than covered employees, and was not intended to apply to claims of joint employer liability.  The governing standard for determining the existence of a joint employment relationship remains *Martinez*.  Because no evidence demonstrates that Shell was appellant's employer, either solely or jointly, summary judgment was properly granted.

## DISPOSITION

The judgment is affirmed.  Equilon is to recover costs on appeal.

_____
Sanchez, J.

WE CONCUR:


_____
Margulies, Acting P.J.


_____
Banke, J.

Trial Court:            Contra Costa County Superior Court

Trial Judge:           Hon. Barry P. Goode

Counsel:

Bleau Fox, PLC, Samuel T. Rees, Lichten & Liss-Riordan, P.C., Shannon E. Liss-Riordan, for Plaintiff and Appellant

Lafayette & Kumagai LLP, Gary T. Lafayette, Syusan T. Kumagai, Barbara L. Lyons, for Defendant and Respondent

*A151626 Henderson v. Equilon Enterprises, LLC*